In re HANSON, Superior Court Judge.
No. 2311.

Supreme Court of Alaska.
Feb. 14, 1975.

R. Collin Middleton, Mark Rowland, Anchorage, for Superior Court Judge James A. Hanson.

Arden E. Page, Anchorage, for Commission on Judicial Qualifications.

Robert L. Eastaugh, Anchorage, for Anchorage Times Publishing Co., as amicus curiae.

## OPINION

Before RABINOWITZ, C. J., and CONNOR and FITZGERALD, JJ.

RABINOWITZ, Chief Justice.

This petition marks only the second occasion on which a matter originating before the Commission on Judicial Qualifications has reached this court.[1] In this petition Superior Court Judge James A. Hanson asks us to reject the Commission's recommendation that he be publicly censured for conduct prejudicial to the administration of justice that has brought the office of superior court judge into disrepute.

Briefly the procedural background of this disciplinary matter is as follows: In October of 1973, an Anchorage superior court grand jury, which had been specifically empaneled to look into matters concerning the municipal government of Kenai, sent the Commission a letter in which certain purportedly improper conduct on the part of petitioner Superior Court Judge James A. Hanson was called to the Commission's attention. Subsequently, at a meeting which was held in November of 1973, the Commission determined that it was appropriate to commence a preliminary investigation. Pursuant to Commission Rule 5(b),[2] petitioner was advised by

---

1. In re Robson, 500 P.2d 657 (Alaska 1972), was the first.

2. The current Commission rules, adopted pursuant to AS 22.30.060, became effective on September 8, 1972. Commission Rule 5(b) provides:

Before finally determining that formal proceedings should be instituted, the judge

letter that an investigation was being undertaken, that Arden E. Page had been appointed as an independent investigator, and that the investigation would encompass ten specific incidents and one general area of inquiry. Following a preliminary investigation which spanned several months, on May 16, 1974, the Commission instituted formal proceedings against petitioner by issuing a written notice of formal proceedings.[3]

Petitioner filed both a written answer to the charges and a discovery motion. In response, the Commission provided petitioner with certain documents and tapes, as well as access to grand jury testimony and exhibits. After timely notice, a hearing regarding the charges was held before the Commission.[4] Upon filing its findings of fact and conclusions of law,[5] the Commission recommended, in accordance with AS 22.30.070(c)(2), that the Supreme Court of Alaska publicly censure petitioner for "conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

 Before us petitioner makes the initial contention that the procedures of the Commission do not comport with the procedural requirements of due process. Under the due process clauses of both the United States Constitution and the Alaska Constitution, no person can be deprived of "property" without due process of law. The Commission's procedures are required to meet constitutional due process standards since a judge's interest in continuing in public office is an individual interest of sufficient importance to warrant constitutional protection against deprivation.[6] In determining whether due process has been observed by an administrative agency of the State of Alaska, this court reviews the proceedings of the administrative body

> to assure that the trier of fact was an impartial tribunal, that no findings were made except on due notice and opportunity to be heard, that the procedure at the hearing was consistent with a fair trial, and that the hearing was conducted in such a way that there is an opportunity for a court to ascertain whether applicable rules of law and procedure were observed.[7]

The principal thrust of petitioner's due process argument is directed against the

shall be notified of the nature of the charges . . . and shall be afforded reasonable opportunity to present such matters as he may choose.

3. Commission Rule 7(a) provides that, in the event the Commission determines that formal proceedings should be instituted, "the Commission shall without delay issue a written notice to the judge advising him of the institution of formal proceedings to inquire into the charges against him." The notice must specify in ordinary and concise language the charges against the judge and the alleged facts upon which such charges are based, and inform the judge that he may file a written answer to the charges against him within 15 days after service of the notice upon him.

4. Commission Rule 9 reads in part:
 The judge shall be given at least 15 days written notice by certified mail, return receipt requested, of the date, time and place of the hearing at his last known address.

5. Commission Rule 20 states where pertinent: In all proceedings resulting in a recommendation to the Supreme Court for censure, suspension, or removal, the Commission shall prepare a transcript of the evidence and of all proceedings therein and shall make written findings of fact and conclusions of law with respect to the issues of fact and law in the proceedings.
 Commission Rule 21 provides that in the event the Commission makes a determination recommending censure "the Commission shall promptly file a copy of the recommendation certified by the chairman or secretary of the Commission, together with the transcript and the findings and conclusions, with the clerk of the Supreme Court and shall promptly give the judge notice of such filing, together with a copy of such recommendations, findings, and conclusions." Under Appellate Rule 36 (a), petitioner had "30 days after the filing with the clerk of the supreme court and service upon the judge of a certified copy of the recommendation" in which to petition this court to modify or reject the recommendation.

6. *See* Nichols v. Eckert, 504 P.2d 1359, 1362 (Alaska 1973). In *Nichols*, we held that a nontenured public school teacher's expectation of continued employment is subject to due process protection.

7. K & L Distributors, Inc. v. Murkowski, 486 P.2d 351, 357 (Alaska 1971).

Commission rules, which allow the Commission both to conduct a preliminary investigation and to adjudicate facts and make a recommendation to the supreme court.[8] Grounding his argument on this dual function, petitioner contends that he has been denied "an impartial tribunal because the same agency and individuals, both investigated petitioner's conduct and adjudicated its propriety."

Regarding petitioner's contention, the Commission points out that procedures similar to Alaska's are currently in effect in at least twenty-four states [9] and the District of Columbia. Research discloses that petitioner's due process argument has been rejected by all courts which have considered the question. Keiser v. Bell, 332 F. Supp. 608 (E.D.Pa.1971); In re Haggerty, 257 La. 1, 241 So.2d 469 (1970); In re Kelly, 238 So.2d 565 (Fla.1970); In re Diener and Broccolino, 268 Md. 659, 304 A.2d 587 (1973). These courts have elected to adopt the majority position as stated by Professor Davis in his treatise on administrative law. According to Professor Davis,

State courts, like federal courts, generally hold, with only occasional exceptions, that due process does not forbid the combination with judging of such functions as prosecuting, investigating, and accusing . . . .[10]

Of significance to resolution of the due process question before us is our opinion in In re Cornelius, 520 P.2d 76 (Alaska 1974). There we observed:

The combination of investigative and judicial functions within an agency does not violate due process; a board may make preliminary factual inquiry on its own in order to determine if charges should be filed.[11]

In light of the foregoing precedents, we hold that combination of judicial and investigative functions in the Commission did not violate petitioner's due process rights under either the federal constitution or Alaska's constitution. This dual function, in and of itself, did not result in a biased or partial tribunal. Further, our own review of the entire record fails to disclose any procedural irregularities upon which a claim of denial of procedural due process could be successfully grounded.[12]

8. Commission Rule 5(a) provides:
 The Chairman, upon receiving a verified statement, found upon examination and inquiry to be neither unfounded nor frivolous, alleging facts indicating that a judge is guilty of willful or persistent conduct which is clearly inconsistent with the proper performance of his duties or casts public discredit upon the judiciary or the administration of justice, or that he has a disability seriously interfering with the performance of his duties, which is, or is likely to become permanent in nature, shall make a preliminary investigation to determine whether formal proceedings should be instituted and a hearing held. The Commission may, on its own motion and without receiving a verified statement, make inquiry and a preliminary investigation with respect to the conduct or physical or mental condition of a judge.

9. Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Indiana, Louisiana, Maryland, Michigan, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Carolina, Oregon, Pennsylvania, Tennessee, Texas, Utah, Wisconsin, and Wyoming. *See generally* American Judicature Society, Judi-

cial Disability and Removal Commissions, Courts and Procedures (G. Winters & R. Lowe eds. 1973).
 Petitioner cites In re Laughlin, 153 Tex. 183, 265 S.W.2d 805 (1954), and In re Troy, 300 N.E.2d 159 (Mass.1973), to demonstrate that the Commission procedures for investigating and adjudicating the propriety of judges' conduct are both unique and violative of due process of law. In each case, because there was no Judicial Qualifications Commission, the state supreme court delegated fact-finding powers to masters or a commission prior to the court's removing a judge. In neither case was there a denial of due process.

10. 2 K. Davis, Administrative Law § 13.02, at 181 (1968).

11. 520 P.2d at 84, citing Pangburn v. C.A.B., 311 F.2d 349 (1st Cir. 1962), and Lehigh Portland Cement Co. v. F.T.C., 291 F.Supp. 628 (E.D.Va.1968).

12. We note the Commission's contention that it followed Commission Rule 22, which provides in part:
 [A]ny . . . [Commission] member may take no part in any determination involving a matter which he may have investigated.

■ In reaching our holding on petitioner's due process claim, we are additionally influenced by the fact that article IV, section 10 of the Alaska Constitution lodges in the Supreme Court of Alaska the exclusive adjudicatory power to suspend, remove from office, retire, or censure a justice or judge in the Alaska Court System. Since this constitutional provision vests in us the ultimate authority in disciplinary matters affecting the judiciary, we hold that petitioner's constitutional rights to the protection afforded by due process have not been impinged upon.

■■ The Alaska Commission on Judicial Qualifications was created by a constitutional amendment which became effective in 1968.[13] This amendment is based on a 1966 revision of the judicial article of the California Constitution.[14] In Alaska, after the Commission's preliminary investigation, a hearing may be held before either the Commission or a master.[15] Another facet of petitioner's due process attack on the Commission's procedures is the argument that due process is offended by the Commission's having the option to hear the matter itself or to refer the charges to a master for a hearing. Thus, petitioner contends that the Commission must always appoint a master.[16] We find this contention untenable. The Commission should have the option of referral to a master where the particular matter requires extensive testimony or specialized fact-finding. On the other hand, where the Commission wishes to handle the matter without appointment of a master, we can discern no legal impediment to proceeding in such a manner.

Before discussing the sufficiency of the evidence against petitioner in relation to the charges which were filed against him, two preliminary matters require disposition. Although AS 22.30.050 provides that "[n]o act of the commission is valid unless concurred in by a majority of its members", no statute or Commission rule specifies whether the alleged misconduct must be proved by a preponderance of the evidence, by clear and convincing evidence, or by evidence establishing the conduct beyond a reasonable doubt. In re Robson,[17] our only other opinion involving a petition to modify or reject a recommendation of the Commission on Judicial Qualifications, does not address the standard of proof question.[18]

■ Of the courts of other jurisdictions which have considered the question of the appropriate standard of proof, all have rejected the beyond-a-reasonable-doubt standard that controls criminal prosecutions.[19]

---

A fair reading of the record could lead to the conclusion that Arden Page conducted the investigation and the Commission performed what was essentially an adjudicatory role.

13. Alaska Const. art. IV, § 10.

14. Cal.Const. art. VI, § 18. *See* In re Robson, 500 P.2d 657 (Alaska 1972). The rules of the Alaska Commission on Judicial Qualifications are very similar to Rules 901 through 921 of the California Rules of Court. In both California and Alaska, after the Commission's preliminary investigation, a hearing may be held before either the Commission or a master. *Compare* California Court Rule 907 with Alaska's Commission Rule 9.

15. Commission Rule 9 reads in pertinent part:
[T]he Commission may order a hearing to be held before it concerning the censure, removal or retirement of the judge, or the Commission may appoint a master to hear and take evidence in such matter, and to report thereon to the Commission.

16. Petitioner notes that in Geiler v. Commission on Judicial Qualifications, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973), three masters were appointed to conduct the hearing in a California judicial removal proceeding. After the hearing, the masters filed a report with the Commission, which then heard oral argument prior to making findings of fact and a recommendation to the Supreme Court of California. Although petitioner failed to request appointment of a master to conduct the hearing, he contends that the Commission, by failing to appoint a master as was done in *Geiler*, denied him due process of law.

17. 500 P.2d 657 (Alaska 1972)..

18. The Commission asserts that counsel for petitioner was advised prior to the proceedings that the civil burden of proof by a preponderance of the evidence would apply. Presumably this standard was employed by the Commission.

19. In In re Kelly, 238 So.2d 565, 569 (Fla. 1970), the court held that proceedings before

Most of these same courts have also declined to adopt the civil preponderance-of-the-evidence standard in favor of the seemingly higher burden of proof by clear and convincing evidence.[20] The rationale for the clear and convincing burden was articulated by the Supreme Court of Texas in In re Laughlin in the following manner:

[T]he serious nature of the proceeding in depriving one of a public office . . . ought, at the very least, to require proof by clear and convincing evidence.[21]

Given the character of the proceedings below and the nature of the public office, we are persuaded that the appropriate standard to be applied in regard to Commission proceedings is that of clear and convincing evidence.

The second preliminary matter which requires our examination involves the scope of this court's review of the evidence adduced before and the recommendation of the Commission. In In re Robson, we observed:

Regarding the scope of review which this court should exercise in reviewing findings of fact of the commission, we see no reason to depart from the substantial evidence test which we have heretofore employed in reviewing matters coming to this court from administrative agencies and other governmental bodies.[22]

In our opinion in In re Robson, we noted that the question of the scope of judicial review had "not been alluded to in the parties' briefs."[23] Here the question has been briefed in connection with the instant petition, and we thus consider this an appropriate occasion to reexamine the scope of this court's review in judicial qualifications proceedings. It appears that Alaska is the only jurisdiction which follows the substantial evidence test in reviewing Commission factual findings. In other states, including California, the supreme court undertakes an independent evaluation of the evidence and the recommendation of the Commission.[24]

■ In Geiler v. Commission on Judicial Qualifications, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973), the Supreme Court of California described its role as follows:

We must . . . decide the appropriate standard for this court to employ in reviewing a recommendation by the Commission. Were this recommendation of independent force and effect absent further action by this court, our review of the evidentiary basis for that recommendation might properly be limited to a determination whether the Commission's findings of fact were supported by substantial evidence. . . . [However], since the ultimate,·dispositive decision to censure or remove a judge has been entrusted to this court, we conclude that in exercising that authority and in meeting our responsibility we must make our own, independent evaluation of the record evidence adduced below. After conducting such a review we may then decide as a question of law whether certain conduct, which we may have found as a fact to have occurred, was 'wilful misconduct in office' or 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.'

judicial qualifications commissions lack the essential characteristics of a criminal prosecution.

20. Geiler v. Commission on Judicial Qualifications, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973); In re Diener and Broccolino, 268 Md. 659, 304 A.2d 587 (1973); In re Laughlin, 153 Tex. 183, 265 S.W.2d 805 (1954).

21. 265 S.W.2d at 809.

22. 500 P.2d at 659. The substantial evidence standard for administrative review is set forth in AS 44.62.570(c). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963).

23. 500 P.2d at 659.

24. Geiler v. Commission on Judicial Qualifications, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973); In re Haggerty, 257 La. 1, 241 So.2d 469 (1970); In re Kelly, 238 So.2d 565 (Fla.1970); In re Diener and Broccolino, 268 Md. 659, 304 A.2d 587 (1973).

(Cal.Const., art VI, § 18.) Finally, it is to be our findings of fact and conclusions of law, upon which we are to make our determination of the ultimate action to be taken, to wit, whether we should dismiss the proceedings or order the judge concerned censured or removed from office.[25]

Article IV, section 10 of the Alaska Constitution and AS 22.30.070(c) unambiguously establish the Supreme Court of Alaska as the body entrusted with the ultimate dispositive decision in a judicial qualifications matter.[26] In light of this constitutional grant and adopting the reasoning of *Geiler,* we conclude that this court's scope of review in a judicial qualifications proceeding should be that of an independent evaluation of the evidence.[27]

We now reach the question of whether the evidence before the Commission established conduct, on the part of Judge Hanson, violative of either the Canons of Judicial Ethics or AS 22.30.070(c)(2).[28] The Commission found violations of the Canons of Judicial Ethics or AS 22.30.070(c)(2) in Count I, a portion of Count II, a portion of Count III–B, and Count III–C; the remaining allegedly improper conduct was found not to constitute violations of either the Canons or the statute. Count I alleged:

1. That [petitioner] became aware of a reduction in Mayor Steinbeck's grocery business during the Kenai Grand Jury proceedings of April 26, 1973 through July 24, 1973.

2. In response [petitioner] stated the intention to, and in fact did, publicly socialize with Mayor Steinbeck with the intent of bolstering the community reputation of Mr. Steinbeck for the purpose of encouraging patronage of his business.

The Commission found that petitioner became aware of a drop-off in the grocery business owned by Kenai Mayor John Steinbeck, who was a friend of petitioner's and with whom petitioner had previously socialized. The Commission further found that in response petitioner

stated his intention to, and in fact did publicly socialize with Mayor John Steinbeck. The public appearance with Mayor Steinbeck was not such as would otherwise have occurred at that time and in such public places were it not for the express purpose of bolstering the community reputation of Mayor Steinbeck for the purpose of encouraging his business.

The Commission concluded that Judge Hanson's conduct constituted use of his judicial office "to promote private business interests, in violation of Canon 25 of the Canons of Judicial Ethics . . . and . . . conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of AS 22.30.070(c)(2)."

Canon 25 of the Canons of Judicial Ethics states in pertinent part:

A judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize . . . private business ven-

25. 110 Cal.Rptr. at 204, 515 P.2d at 4.

26. Article IV, section 10 of the Alaska Constitution provides in part that "a justice or judge may be disqualified from acting as such and may be suspended, removed from office, retired, or censured by the supreme court upon the recommendation of the commission." AS 22.30.070(c)(2) states that:

On recommendation of the commission, the supreme court may . . . censure or remove a judge for action . . . which constitutes wilful misconduct in the office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct

prejudicial to the administration of justice that brings the judicial office into disrepute.

27. In briefing and oral argument, counsel for the Commission has urged adoption of the independent review standard.

28. On September 17, 1973, the Supreme Court of Alaska promulgated the Code of Judicial Conduct, which was made effective as of that date. Petitioner's alleged conduct occurred prior to September 17, 1973, and hence was governed by the Canons of Judicial Ethics, which were superseded by the new Code of Judicial Conduct.

tures . . . . He should, therefore, not . . . pursue such a course of conduct, as would justify such suspicion, nor use the power of his office or the influence of his name to promote the business interests of others . . . .

The record shows that during the grand jury investigation of the Kenai municipal government, the local newspaper carried a headline that the investigation was underway. Shortly after the appearance of this article, Judge Hanson learned that Mayor Steinbeck's grocery business had indeed dropped off, allegedly because of the rumors which were circulating in Kenai at the time regarding the grand jury investigation and the mayor's absence from the community. The news of his friend's misfortune was personally upsetting to Judge Hanson. While still in this emotional state, Judge Hanson encountered Thomas Wardell, the district attorney of the Kenai area, and told Wardell

> [t]he people have already convicted the guy and there hasn't even been a grand jury. . . . [Y]ou know, I think I'm going to go out to dinner with him and show these folks that I don't think he's guilty of anything . . . .

When questioned as to his intent in dining publicly with Mayor Steinbeck, Judge Hanson replied:

> I had some thoughts about not guilty until proven guilty. Or innocent until proven guilty. I thought I'd show that.

On another occasion during his testimony, Judge Hanson was asked whether he had hoped to instill confidence in Mr. Steinbeck by being seen publicly with him. In response, Judge Hanson stated, "It sounds very arrogant but I guess so, yes."

The Commission asserts that the district attorney's recollection of the conversation differs from that of Judge Hanson. Thomas Wardell testified that:

> Judge Hanson mentioned that John Steinbeck, the mayor of Kenai, mentioned that John Steinbeck's business had fallen off substantially. The business being the supermarket which is located in downtown Kenai, and he indicated that he was going out with Mayor Steinbeck . . . that Friday evening, I believe and be seen with him in as many places as they could be seen, bars and restaurants.

Q Did the judge tell you what his intention was in doing so?

A I don't believe he did. I believe he mentioned—just what I have testified to.

Q Simply the fact that business had dropped off, one, and the intention of being seen with the mayor?

A Yes.

We hold that the record does not clearly and convincingly demonstrate a violation of either Canon 25 of the Canons of Judicial Ethics or AS 22.30.070(c)(2). An objective appraisal of petitioner's conduct and its impact on the administration of justice leads us to this conclusion. Here the uncontroverted evidence shows that Judge Hanson and his family were old friends of the mayor and his family, and that they had in the past socialized frequently. On this record we cannot find that, by taking dinner in public with his friend, Judge Hanson utilized the power or prestige of his office as a superior court judge to persuade the people of Kenai to patronize Mayor Steinbeck's grocery. Nor can we conclude that this public dinner with the Mayor of Kenai furnished the basis for reasonable suspicion that petitioner was using the power or prestige of his office to financially assist Mayor Steinbeck's business.[29] Existing precedent under Can-

---

29. In his brief, petitioner relies in part on three Canons, namely, 3, 14, and 33 to support his contention that the charges under Count I were erroneously decided by the Commission.

Canon 3 provides:
It is the duty of all judges in the United States to support the federal Constitution and that of the state whose laws they administer; in so doing, they should fear-

on 25 is clearly distinguishable from the factual situation portrayed in this record.[30] The instant case presents a single isolated occasion of a judge having dinner with a family friend, who has not been indicted. This is a far cry from the type of improper conduct which Canon 25 was designed to prohibit. Judged by objective standards, any signal emanating from this public repast was rather weak and ambiguous and one that we cannot characterize as involving improper persuasion or coercion, or the appearance thereof, employed to promote the grocery business of Mayor Steinbeck.[31]

In part, Count II of the Commission's complaint charged that petitioner, on May 3, 1973, disqualified himself from all proceedings concerning the Kenai Grand Jury, and

[t]hat in the course of the Kenai Grand Jury Special Investigation [petitioner] was contacted by Sharon Sterling, an employee of the City of Kenai, in regard to a request by investigators that Mrs. Sterling turn over mail or monitor mail directed to Edwin Glotfelty.

That in response to the foregoing, [petitioner] advised Mrs. Sterling that, if a similar request were directed to him, he would not comply with the Investigator's request without a court order.

The complaint further alleged that the foregoing, constituted "the rendering of legal advice or personal involvement in matters [petitioner] had disqualified himself, all of which constituted improper conduct in violation of Canon 4 of the Canons of Judicial Ethics in effect." The Commission found that petitioner's conduct was violative of Canon 4 of the Canons of Judicial Ethics. Canon 4 provides:

A judge's official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach.

As to this portion of Count II, review of the record discloses the following: During the time the Kenai grand jury investigation was taking place, the then city clerk, Sharon Sterling, was contacted by investigators who interrogated her. According to Mrs. Sterling, "they at one time wanted me to take out all the personal—take down the addresses or who—all Ed Glotfelty's personal mail was from and list it and give it to them." Mrs. Sterling further testified that this request upset her because she didn't "think that this was right that anybody . . . I thought people had more rights than that. I didn't think they could do it without a court order." Mrs. Sterling then went to see Judge Hanson, initially informing the judge that she desired to speak to him concerning a child support proceeding.[32] Her recollection of the event is:

Well, I did ask him a little bit about that [child support matter], but I said I

---

lessly observe and apply fundamental limitations and guarantees.

Canon 14 provides:

A judge should not be swayed by partisan demands, public clamor or considerations of personal popularity or notoriety, nor be apprehensive of unjust criticism.

and Canon 33 reads as follows:

It is not necessary to the proper performance of judicial duty that a judge should live in retirement or seclusion; it is desirable that, so far as reasonable attention to the completion of his work will permit, he continue to mingle in social intercourse, and that he should not discontinue his interest in or appearance at meetings of members of the bar. He should, however, in pending or prospective litigation before him be particularly careful to avoid such

action as may reasonably tend to awaken the suspicion that his social or business relations or friendships constitute an element in influencing his judicial conduct.

30. *Compare* Cincinnati Bar Ass'n v. Heitzler, 32 Ohio 2d 214, 291 N.E.2d 477 (1972).

31. Implicit in our conclusion regarding this count is our rejection of the Commission's argument that petitioner's conduct was tantamount to an explicit public comment on a pending matter.

32. At one point in her testimony, Mrs. Sterling was asked, "Why didn't you go to the police for instance?" Her reply was, "Well I needed some legal advice and I just didn't think the police had that advice for me."

really have something on my mind that has been bothering me . . . . I was pretty shook, I think I probably came to a little tears . . . [and] I asked him, I said, 'is it right, do they have a right to do that, can they force me to do that?' I asked him, 'Well what shall I do?' and he said, 'Well, Sharon if it was me I wouldn't do it'. He didn't think that without a court order that it was right.

Judge Hanson's account of this encounter with Mrs. Sterling is that

[s]he sat down and began to cry. And told me . . . and I'm certain that I thought that she told me, at the time, 'They are trying to get Ed's mail. . . . They want me to turn over Ed's mail but I won't do it, and then they told me that I had to write down the return addresses and the postmark information. Do I have to do that?' . . . I told her that 'I'm not supposed to tell you what to do Sharon, but if they . . . if somebody asked me to turn over somebody else's private mail, I certainly wouldn't do it unless I had a court order.' She left. I picked up the phone immediately and called Mr. Wardell on the intercom and told him what was happening. He said that he would take care of it immediately and I never heard of it again. . . .

■ Independent review of the record leads us to conclude that the evidence fails to show clearly and convincingly that petitioner's conduct constituted impropriety or the appearance of impropriety according to the provisions of Canon 4 of the Canons of Judicial Ethics. Here the instance of purported misconduct arose out of an unsolicited, emotional encounter with Mrs. Sterling. Any possible impropriety was in our view so attenuated in character that we hold Canon 4 of the Canons of Judicial Ethics was not breached. We also find it of significance that Judge Hanson immediately informed the district attorney of what had transpired between Mrs. Sterling and himself.[33] In reaching this disposition of Count II, we reject the proposition offered by the Commission that Judge Hanson could, without violating Canon 4, give advice to a personal friend but not to an "individual known only remotely by the judge."[34]

Count III–B of the complaint charged that petitioner appeared and offered sworn testimony before a grand jury hearing evidence related to the special investigation of Kenai city government and

[t]hat during the examination the following question was asked and the following answer given by [petitioner] on the subject of secrecy and the disclosure

33. Petitioner states that he believed a violation of federal law by the police officer was involved since he thought Mrs. Sterling had been asked to surrender the mail. In this context, petitioner asserts that not only did he have the right to inform a citizen when he believed her rights were being abridged, but he also had a duty to do so under Canon 3 of the Canons of Judicial Ethics. Canon 3 provides:

It is the duty of all judges in the United States to support the federal Constitution and that of the state whose laws they administer; in so doing, they should fearlessly observe and apply fundamental limitations and guarantees.

34. Count II of the complaint additionally charged that Mayor Steinbeck requested the advice of petitioner concerning the advisability of submitting to a polygraph examination;

that petitioner advised Mr. Steinbeck that petitioner would submit to a polygraph examination if petitioner were not guilty of criminal conduct. The complaint further alleged that petitioner, during the course of the Kenai Grand Jury Special Investigation, "was approached by Bruce Massey, a personal friend and former city employee, regarding possible testimony of Mr. Massey before the Kenai Grand Jury. That [petitioner] advised Mr. Massey that the matter of testimony was a subject in which the Kenai Grand Jury was not interested and that Mr. Massey should discuss the matter with District Attorney Wardell." Concerning these charges, the Commission concluded that the conduct alleged did "not constitute the rendering of legal advice or personal involvement in matters in which [petitioner] had disqualified himself."

of information received by a witness during a Grand Jury appearance:

'Q. How about the information that they hear in relationship to the question?

A. I don't think that—I don't know. I wouldn't think they should divulge that.'

That during additional testimony [petitioner] made the following statement to the Grand Jury:

'I don't want to cut you off but I will say that I will not until your investigation has concluded, discuss any aspect of this afternoon with anybody not in this room presently.'

That thereafter, [petitioner] on August 29, 1973, conferred with District Attorney Thomas Wardell and James Hanley.

. . . . . .

That the effect of . . . [this] conference was to disclose aspects of Grand Jury proceedings contrary to the promise above quoted.

The Commission found that the effect of Judge Hanson's conference with District Attorney Thomas Wardell and James Hanley was to disclose aspects of the grand jury proceedings, contrary to the judge's promise, and therefore constituted "impropriety and the appearance of impropriety in the course of judicial duties in violation of former Canon of Judicial Ethics number 4 and . . . conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of AS 22.30.070(c)(2)."

The evidence shows that the day following his appearance before the grand jury, petitioner conferred with District Attorney

Thomas Wardell and James Hanley, Mr. Wardell's summer legal intern, and disclosed certain aspects of the grand jury proceedings.[35]

Petitioner makes several arguments in support of his contention that his conduct in question under Count III–B did not contravene either Canon 4 or AS 22.30.-070(c)(2). Petitioner asserts that "his memory of the assurance to the grand jury was that he would not discuss *his testimony* before the body." It is further argued that since the promise of petitioner came at the very end of his appearance before the grand jury, no information was given to him in reliance upon the assurance. Petitioner then states that no assurance would have been given by him "if he had realized that he was being placed in jeopardy of prosecution through the introduction of perjured testimony." In arguing that his conduct was not proscribed by either statute or rule, petitioner points to Criminal Rule 6(*l*) which provides:

*Secrecy of Proceedings and Disclosure.* Disclosure of matters occurring before the grand jury, other than its deliberations and the vote of any juror, may be made to the prosecuting attorney for use in the performance of his duties. Otherwise a juror, attorney, interpreter, deputy clerk of the court or stenographer may disclose matters occurring before the grand jury only when so directed by the court preliminary to or in connection with a judicial proceeding. *No obligation of secrecy may be imposed upon any person except in accordance with this rule.* . . . (emphasis added)

From the above, petitioner concludes that no obligation of secrecy could be imposed

---

35. The Commission's evidence shows that Judge Hanson informed Wardell and Hanley that he believed the grand jury was attempting to indict him for "misfeasance, malfeasance, obstructing justice, or perjury". Judge Hanson also told them he believed the grand jury "was attempting to gather evidence that Mr. Wardell is guilty of obstructing justice." The Commission's evidence further disclosed that "Judge Hanson related a conversation he had with an older man on the present Grand Jury in which the old man supposedly accused Judge Hanson of being part of a 'clique' in Kenai in which the select few divided up the pie among themselves." Also relevant to this count is the Commission's evidence that "Judge Hanson related his belief that one of the State's investigators . . . had lied two or three times before the present Grand Jury sitting in Anchorage."

upon him and that, faced with the "possibility of professional destruction, the disclosures petitioner made and protection sought from proper and authorized agencies does not seem a disregard of such assurance, but consistent with its apparent purpose."

In contrast, the Commission argues that petitioner's subjective understanding of his statement to the grand jury and his assertions regarding the legal boundaries of permissible conversation by a witness before a grand jury "are again inconsistent with the objective and accurate effects of the judge's contact." More particularly, the Commission argues that "The objective effect of the judge's activity was to breach a promise voluntarily given to a grand jury of laymen. The effect of that breach, without regard to the subjective motivations of petitioner, was to cast total doubt on the assurances given to laymen by a member of the judiciary." [36]

■ Although resolution of this issue presents a difficult problem, we hold that Criminal Rule 6(*l*) is controlling here. Any promise made to the grand jury by petitioner arose from his capacity as a witness before that body, not as a judge of the superior court. Under Criminal Rule 6(*l*), "[n]o obligation of secrecy may be imposed" upon a witness who appears before a grand jury. The purpose of this rule is to prevent the injustice that could result "if a witness [were] not permitted to make a disclosure to counsel or to an associate." [37] The salutary objective of

the rule would be thwarted if we were to sanction nondisclosure obligations prohibited by Criminal Rule 6(*l*). As a witness, petitioner was not bound by his promise, which the grand jury had no authority to extract. We therefore hold that the questioned conversation between petitioner and the district attorney, and his assistant, does not constitute a violation of Canon 4 or AS 22.30.070(c)(2).

This brings us to consideration of the last remaining count put in issue by this petition. Count III–C alleged that, during the time that the Kenai grand jury special investigation was in progress, petitioner was approached in chambers by Frank Wisecarver regarding the likelihood of Wisecarver's being indicted by the Kenai grand jury. In response to this contact, petitioner "approached Grand Jury Investigator Charles Reed of the Alaska State Troopers and requested advice of Investigator Reed as to the likelihood of Mr. Wisecarver being indicted by this Grand Jury." The charge concluded with the allegation that petitioner's request sought the disclosure of information from the grand jury of a "secret nature".

The Commission decided that petitioner's conduct constituted "impropriety and the appearance of impropriety in the course of judicial duties in violation of former Canon of Judicial Ethics number 4 and . . . conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of AS 22.30.070(c)(2)."

36. The California Supreme Court in Geiler v. Commission on Judicial Qualifications, 10 Cal. 3d 270, 110 Cal.Rptr. 201, 205, 515 P.2d 1, 5 (1973), emphasized the importance of appraising alleged judicial misconduct objectively rather than subjectively.
[The] focus [should be] on an *objective* appraisal of petitioner's conduct in terms of the effect of such conduct on the administration of justice. (emphasis in original)

37. The quoted language is taken from the 1966 Notes of the Advisory Committee on Criminal Rules commentary on Federal Rule of Criminal Procedure 6(e), which is, in all pertinent respects, identical to Alaska Criminal Rule 6(*l*). 8 J. Moore, Federal Practice ¶ 6.01, at 6–6 (2d ed. R. Taylor & M. Harley rev. 1974). *See also* C. Wright, Federal Practice and Procedure: Criminal § 106, at 171 (1969). In the federal courts, no obligations of secrecy may be imposed upon witnesses before a grand jury. *See, e. g.*, In re Grand Jury Summoned October 12, 1970, 321 F. Supp. 238, 240 (N.D.Ohio 1970); In re Petition for Disclosure of Evidence before the October, 1959 Grand Jury of This Court, 184 F.Supp. 38, 41–42 (E.D.Va.1960); In re Hearings before the Committee on Banking and Currency of the United States Senate, 19 F.R.D. 410, 412 (N.D.Ill.1956), vacated on other grounds, 245 F.2d 667 (7th Cir. 1957).

The evidence reveals that petitioner was approached by his friend Frank Wisecarver, Chief of the Kenai Fire Department who stated that he believed that he had been turned down for a bank loan because of rumors that he was going to be indicted by the grand jury then investigating Kenai's municipal government. Petitioner then telephoned the district attorney's office, spoke with a grand jury investigator, and inquired of that investigator whether Frank Wisecarver was going to be indicted by the grand jury.[38]

At one point in his testimony, petitioner testified as follows:

Q Judge, was it your intent to arrive at this information—at the information of whether or not Mr. Wisecarver would be indicted prior to the grand jury returning formal indictments?

A Was it my intent to find that out before the grand jury came down?

Q Right, before they formally disbanded and presented their indictments to whatever judge heard it.

A Yes.

Petitioner contends that the findings and conclusions pertaining to Count III-C "simply have no evidentiary basis."[39] The Commission counters, arguing that by virtue of asking the question, "petitioner expected to receive information prior to formal release of the information upon the conclusion of grand jury matters. Petitioner in addressing his question to Investigator Reed knew the role of Investigator Reed in the investigation of the Kenai grand jury and knew that Investigator Reed could provide the requested information. Petitioner understood that the role of Investigator Reed was sufficiently close

to the grand jury to guarantee accuracy in the information conveyed by Investigator Reed." Our review of the record convinces us that the Commission was correct in finding that petitioner's conduct in relation to Count III-C was in violation of Canon 4 of the Canons of Judicial Ethics and AS 22.30.070(c)(2).[40]

This leads us to the final issue in this matter. In light of its findings, the Commission recommended that the Supreme Court of Alaska take the following action with regard to petitioner:

That Judge James A. Hanson be publicly censured by the Supreme Court of Alaska for conduct prejudicial to the administration of justice which has brought [petitioner's] judicial office into disrepute by reasons of those activities . . . found to constitute a violation of the Canons of Judicial Ethics then in effect and AS 22.30.070(c)(2).

In re Robson[41] discusses this court's scope of review of the Commission's recommendations. There we said:

Concerning the subject of sanctions article IV, section 10 of the Alaska Constitution, and AS 22.30.070(c)(2), provide that upon the recommendation of the commission the Supreme Court of Alaska may suspend, remove, retire or censure a judge. Under this discretionary grant, our review of a particular recommendation by the commission is necessarily broader than the substantial evidence criterion adopted for review of findings of fact made by the commission. Normally considerable weight will be accorded to a given recommendation from the commission, if supported by an adequate factual basis. Nevertheless, both

---

38. According to Chief Wisecarver's recollection, petitioner prefaced his inquiry with "I don't want you to tell me anything, you know, that wouldn't be permissible, but . . . ."

39. Petitioner makes the additional contentions that there is an absence of any evidence showing Trooper Reed had any connection with the grand jury and that petitioner did not seek the disclosure of information from the grand jury of a secret nature.

40. We find it unnecessary to discuss the Commission's findings and conclusions as to the charges of which it absolved petitioner of any violation of the Canons of Judicial Ethics or AS 22.30.070(c)(2). Our review indicates that all are in agreement with the Commission's dispositions of these charges.

41. 500 P.2d 657, 659 (Alaska 1972).

article IV, section 10 of the constitution and AS 22.30.070(c)(2) clearly establish that the Supreme Court of Alaska is to exercise its independent judgment in determining an appropriate sanction, if any, as to any recommendation made by the commission. It would be tantamount to an abdication of our constitutional and statutory obligations if we were to automatically adopt the commission's sanction recommendations. . . . We are . . . obligated to decide whether the commission's recommended sanction is justified by the record and is in accord with the objectives of the commission as reflected in the relevant constitutional and statutory provisions.

Exercising our independent review of the Commission's recommendation, we conclude that censure is the appropriate sanction in this case.[42] For we believe there is considerable merit in petitioner's evidence which was intended to show that some of his actions were designed to combat what he genuinely felt was a "runaway" grand jury. Furthermore petitioner rather cogently argues that none of his conduct was directed toward personal gain, but was motivated by a desire to prevent what he perceived to be the potential "destruction of an individual's rights by unwarranted abuse of executive authority."

The findings and conclusions of the Commission on Judicial Qualifications are affirmed in part and reversed in part in accordance with the foregoing. We conclude that Judge James A. Hanson should receive a censure.[43]

Affirmed in part, reversed in part.[44]

ERWIN and BOOCHEVER, JJ., not participating.

42. In reaching this conclusion, we reject petitioner's assertion that he was entitled to a separate hearing before the Commission on the question of the appropriateness of any given sanction. Neither considerations of procedural due process nor the Commission's rules of procedure provide for this separate hearing.
 Assuming degrees of censure are appropriate, we think petitioner's conduct warrants only a mild censure.

43. In In re Robson, 500 P.2d 657, 661 (Alaska 1972), we said:
 By making our sanction part of the public record, we believe that the public's confidence will be maintained, both in the workings of the commission and in the ability of the judicial branch of government to insure its continued integrity. (footnote omitted)

44. We wish to express our gratitude to respective counsel, as well as to counsel for the amicus, for filing supplementary briefs pertaining to the confidentiality of judicial qualifications proceedings in this court and to the confidentiality of the record once a final order is entered in the matter by this court. These briefs will be of considerable assistance to this court in its study of the questions as they relate to the necessity to revise our rule of appellate procedure governing petitions from the Commission on Judicial Qualifications.